**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **CAROLINA STAR-MANNING** | : | **CIVIL ACTION NO.** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **DAY KIMBALL HEALTHCARE, INC.** | : | |
| **Defendant** | : | |
| | : | **MAY 18, 2020** |

## COMPLAINT

### I.   INTRODUCTION

1. Plaintiff Carolina Starr-Manning brings this action against her former employer, Defendant Day Kimball Healthcare, Inc., for retaliating against her because she complained of sexual harassment in the workplace, and for discriminating against her on the basis of her sex and because she suffers from a disability which required her to take a medical leave of absence.  Defendant's discriminatory and retaliatory conduct violated Plaintiff's rights under federal laws, including Title VII of the Civil Rights Act of 1964, as amended, the Americans with Disabilities Act, and the Family Medical Leave Act, as well as under Connecticut law, including the Connecticut Fair Employment Practices Act.

### II.   PARTIES

2. Plaintiff, Carolina Starr-Manning, is an individual residing in the State of Connecticut.

3. Defendant, Day Kimball Healthcare, Inc., is a corporation incorporated under the laws of the State of Connecticut, and with a principal place of business in the State of

Connecticut.  Defendant manages and operates Day Kimball Hospital and is located in Putnam, Connecticut.  Defendant employs more than 1,000 employees.

### III.   JURISDICTION

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff has alleged violations of federal statutes, Title VII of the Civil Rights Act of 1964, as amended, the Americans with Disabilities Act, and the Family Medical Leave Act.  This Court has supplemental jurisdiction over Plaintiff's state law claims under the Connecticut Fair Employment Practices Act pursuant to 28 U.S.C. § 1367(c).

5. Plaintiff has also exhausted the administrative remedies with respect to each of her claims for which administrative exhaustion was necessary.

6. On October 28, 2019, Plaintiff filed a complaint with the Connecticut Commission on Human Rights and Opportunities, which was dual-filed with the U.S. Equal Employment Opportunity Commission.  The administrative complaint alleged that Defendant discriminated against her on the basis of sex and mental disability, and retaliated against her because she opposed discriminatory conduct in the workplace.  The administrative complaint alleged violations of Title VII of the Civil Rights Act of 1964, as amended, the Americans with Disabilities Act, and the Connecticut Fair Employment Practices Act. The administrative complaint was designated as CHRO No. 2040138, and EEOC No. 16A-2020-00152.

7. In February 2020, the Commission on Human Rights and Opportunities issued a notice stating that "CHRO has conducted a review of the file and has retained the complaint for further processing."

8.  On May 7, 2020, in response to a request from Plaintiff, the Commission on Human Rights and Opportunities issued Plaintiff a release of jurisdiction authorizing Plaintiff to pursue her claims in court.

9.  On May 12, 2020, in response to a request from Plaintiff, the U.S. Equal Employment Opportunity Commission issued Plaintiff a right to sue letter authorizing Plaintiff to pursue her claims in court.

10. Plaintiff has commenced this action within 90 days of receiving the release of jurisdiction from the Commission on Human Rights and Opportunities and the right to sue letter from the Equal Employment Opportunity Commission.

## IV.    BACKGROUND

11. Plaintiff, a Registered Nurse and a certified oncology nurse with a Master's degree in Nursing, commenced her employment with Defendant on December 28, 2015, as an Oncology Nurse Navigator.

12. After a brief break in service in 2016, Defendant re-hired Plaintiff in a more senior Director position in November 2016.

13. On November 22, 2016, Defendant offered Plaintiff employment in the position of Director, Hematology/Oncology, which Plaintiff accepted.

14. In her Director position, Plaintiff reported to John O'Keefe, Defendant's Vice President of Patient Care Services and its Chief Nursing Officer.

15. Plaintiff's position was later expanded to include supervision of eight departments with a combined staffing of over 100 employees.

16. After Plaintiff's job was expanded, her title became Director of Critical Care and Cancer Services.

17. For more than two years, Plaintiff consistently met the job requirements and expectations of her position and consistently received positive feedback.

18. In early 2019, however, shortly after Plaintiff disclosed her disability, took a medical leave of absence, and reported inappropriate sexual behavior by another employee, Defendant began treating Plaintiff differently and ultimately made it clear that it would be terminating her employment.

19. Plaintiff suffers from Major Depressive Disorder and is a disabled person within the meaning of the Americans with Disabilities Act and the Connecticut Fair Employment Practices Act.  Plaintiff's impairment also constitutes a serious health condition within the meaning of the Family Medical Leave Act.

20. Due to increasing workplace stressors, including the fact that three staff members brought complaints against her, Plaintiff had a severe episode of depression in January 2019.

21. From January 8, 2019 through January 28, 2019, Plaintiff took a medical leave of absence pursuant to the Family Medical Leave Act.

22. Plaintiff advised Mr. O'Keefe of her need for FMLA leave due to severe depression.

23. On January 10, 2019, two days into Plaintiff's medical leave, Plaintiff alerted Jeff Corrigan, Defendant's Vice President of Human Resources, that she had been subjected to unwanted sexual advances from a staff member.

24. As soon as Plaintiff returned from her medical leave in late January, Defendant began subjecting Plaintiff to a series of discriminatory and retaliatory actions.

25. On January 28, 2019, Plaintiff's first day back from medical leave, Mr. O'Keefe met with Plaintiff and informed her that staff "were not happy with [her] leadership."  Mr. O'Keefe also stated that Plaintiff needed to "be careful" because—referring to Plaintiff's medical

leave—"now it looks like you can't handle being a leader."   Mr. O'Keefe then advised

Plaintiff to "think about" whether Plaintiff was "cut out" for her position.

26. On January 29, 2019, Plaintiff met with both Mr. O'Keefe and Mr. Corrigan at which

time Mr. Corrigan informed Plaintiff that the investigations concerning complaints that

had been made against her and regarding Plaintiff's claim of unwanted sexual advances

were "still ongoing" and that he "had not prioritized it" because he "thought [Plaintiff]

would be out longer."

27. On March 4, 2019, during a meeting with Messrs. O'Keefe and Corrigan, Plaintiff was

advised that she was being put on a probation and would be given a 90-day performance

improvement plan. With respect to the complaints made against Plaintiff, Plaintiff was

informed that the investigation did not substantiate the complaints.  When Plaintiff was

asked about her report of unwanted sexual advances, Mr. Corrigan said he had not looked

further into it because the staff member in question "denied it." To Plaintiff's

knowledge, he did not speak with any of the staff members whom Plaintiff identified as

witnesses to the sexual advances.

28. On March 11, 2019, Plaintiff received her 90-day performance improvement plan.  In

contrast to Plaintiff's previous performance evaluations and her actual job performance,

Defendant started claiming that Plaintiff's performance had been deficient for an

extended period of time.

29. In April 2019, Mr. O'Keefe criticized Plaintiff multiple times for allegedly becoming too

"emotional" or failing to keep her emotions in check, and advised Plaintiff that she

needed to "control her emotions."  These comments reflected gender bias and gender

stereotyping against Plaintiff as a female, and also reflected bias against Plaintiff based on her mental health condition.

30. On April 26, 2019, Plaintiff communicated concerns to Mr. Corrigan and Mr. O'Keefe regarding the erratic behavior of a nurse, which negatively impacted the work environment but, more critically, impacted "patient care." Plaintiff specifically stated that this employee, on at least two occasions, had presented serious and potentially life threatening "patient safety issues."

31. On April 30, 2019, Plaintiff was called into a meeting with Mr. O'Keefe and Mr. Corrigan. At the meeting, Plaintiff was told that she was allegedly not taking the 90 day plan "seriously." With Mr. Corrigan present, Mr. O'Keefe informed Plaintiff that she would no longer be supervising one of the departments which previously reported to her. He also stated that he needed to "make a change." Plaintiff asked what that meant and he said "he wasn't sure yet." Plaintiff asked if she was fired and he said he "wasn't sure yet." Plaintiff asked what her options were and he responded, "I don't know." When Plaintiff asked if the safety issues that she had reported had been looked into, Mr. O'Keefe responded that they hadn't been investigated and they "don't need to be," because "we don't think your behavior is appropriate." Plaintiff was then told that she would be given an answer by the end of the day about if she would still be employed by Defendant.

32. The criticisms of Plaintiff's performance during the April 30, 2019 meeting were contrary to the previous evaluations of Plaintiff's performance before Plaintiff disclosed her disability, took a medical leave of absence, and complained about sexual advances by another employee. Defendant advanced these criticisms of Plaintiff as a pretext in order

to manufacture a basis to support the termination of Plaintiff's employment for

discriminatory and retaliatory reasons.

33. As the end of the day on April 30, 2019 approached, Plaintiff had still not received an

answer from Mr. O'Keefe regarding her employment status.  She attempted to call his

office, but was advised that he had already left for the day.  Mr. O'Keefe's assistant

advised Plaintiff that she would attempt to contact Mr. Corrigan.

34. At 5:00 PM on April 30, 2019, Mr. Corrigan called Plaintiff to his office and stated that

"It sounds like John's made up his mind" and "he doesn't think you are taking the 90-day

plan seriously."  At that time, Plaintiff asked what options she had and was told that she

could wait to "hear it officially from John" or "consider a separation agreement."

35. Mr. Corrigan told Plaintiff that taking a separation agreement was the only way to have

the 90-day plan removed from her employee file.

36. At that time, terrified of the position that was in, Plaintiff agreed to have Human

Resources prepare a separation agreement.  Mr. Corrigan cautioned Plaintiff that she

"must say" the decision to leave was her decision or else she would not be able to receive

any severance or future employment benefits from Defendant.

37. As of April 30, 2019, it was clear to Plaintiff that Defendant would be terminating her

employment, but she agreed to have Human Resources prepare a separation agreement in

order to avoid negative consequences for her future ability to obtain employment and

earn a living.

38. On May 2, 2019, Plaintiff communicated with Mr. Corrigan concerning items she

thought should be included in her separation agreement.  Mr. Corrigan told Plaintiff that,

once received, she could take time to review the separation agreement and even take it to

an attorney to review.  Mr. Corrigan told Plaintiff again that she "must say" this was her decision and "not to talk about details."

39. On May 6, 2019, Defendant provided Plaintiff with the Separation Agreement to review. The Separation Agreement stated that Plaintiff's last day would be May 31, 2019. As Mr. Corrigan instructed Plaintiff to do, Plaintiff communicated on one occasion that she had made the decision to leave Day Kimball Hospital.

40. During the week of May 21, 2019, Plaintiff advised Mr. O'Keefe on two occasions that she made the decision not to sign the severance agreement and that she did not want to resign or quit her employment with Defendant.  Mr. O'Keefe responded in both instances that Plaintiff's position "Director of Critical Care and Cancer Services" had been "eliminated."  Mr. O'Keefe again stated, as he previously stated in an earlier meeting, that Plaintiff was not qualified to manage her departments and that "all of those other responsibilities had been reassigned to other leaders within the organization."

41. The following week, during a Management Meeting attended by more than 50 managers, Mr. O'Keefe announced that Plaintiff's last day was going to be May 31, 2019, and, due to the organizational restructuring, he had reassigned Plaintiff's responsibilities to other managers. After the meeting, Plaintiff again reported to Mr. O'Keefe that she was not in agreement with the Separation Agreement and was not going to sign it, and that she was not quitting or resigning.  Plaintiff then asked Mr. O'Keefe what to do after May 31, 2019, and he again stated that Plaintiff's position had been eliminated and duties reassigned to other leaders, adding that there was "nothing" for Plaintiff to do any more.

42. Plaintiff's employment with Defendant ended on May 31, 2019.

**COUNT ONE:**     **VIOLATION OF FAMILY MEDICAL LEAVE ACT**

43. Based on the foregoing, Defendant violated Plaintiff rights under the Family Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA").

44. As of 2019, Plaintiff was an eligible employee under the FMLA because she had been employed more than 12 months and worked more than 1,000 hours during the previous 12 month period.

45. Plaintiff also qualified for medical leave under the FMLA because she suffered from a serious health condition.

46. Plaintiff exercised her rights under the FMLA by taking a qualifying medical leave between January 8, 2019 and January 28, 2019.

47. Defendant approved Plaintiff's medical leave under the FMLA, but retaliated against Plaintiff for taking leave after she returned to work.

48. Defendant retaliated against Plaintiff by making unsupported and incorrect criticisms of Plaintiff's job performance after she returned to work in late January 2019, placing Plaintiff on a performance improvement plan, making it clear to Plaintiff on April 30, 2019 that her employment would be terminated if she did not accept a separation package, and then terminating Plaintiff's employment as of May 31, 2019 when Plaintiff made it clear that she would not be accepting the separation package and would not resign.

49. Defendant's violation of Plaintiff's rights caused Plaintiff to suffer damages, including, but not limited to, lost compensation and benefits.

50. Defendant's disregard for Plaintiff's rights also entitles Plaintiff to an award of liquidated damages.

51. Plaintiff has also incurred, and continues to incur, attorney's fees and costs.

**COUNT TWO:        VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**

52. Based on the foregoing, Defendant discriminated against Plaintiff because of her disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA").

*53.* During her employment with Defendant, Plaintiff suffered from a qualifying disability under the ADA, as she suffered from an impairment which substantially limited one or more of her major life activities, including, but not limited to, concentrating, thinking, working, sleeping, caring for herself, and eating, as well as her neurological and brain functions.

54. Defendant had knowledge of Plaintiff's impairment.

55. In addition, Plaintiff has a record of suffering from a qualifying disability.

56. Plaintiff could perform all of the essential functions of her job, with or without a reasonable accommodation.

57. Defendant discriminated against Plaintiff, subjected Plaintiff to a performance improvement plan, and terminated Plaintiff's employment, because of Plaintiff's disability.

58. Defendant also retaliated against Plaintiff, and discriminated against Plaintiff, in violation of the ADA by subjecting Plaintiff to discrimination and retaliation because Plaintiff exercised her rights to take a medical leave for her disability, which represented a reasonable accommodation for Plaintiff's disability.

59. Defendant's violation of Plaintiff's rights caused Plaintiff to suffer damages, including, but not limited to, lost compensation and benefits, compensatory damages, emotional distress, and loss of enjoyment.

60. Defendant exhibited a reckless disregard of Plaintiff's rights, entitling Plaintiff to punitive damages.

61. Plaintiff has incurred, and continues to incur, attorney's fees and costs in pursuing this action.

**COUNT THREE:    VIOLATION OF CIVIL RIGHTS ACT OF 1964**

62. Based on the foregoing, Defendant violated Plaintiff's rights under Title VII of the Civil Rights Act of 1964, as amended ("Title VII").

63. Defendant retaliated against Plaintiff in violation of Title VII.

64. Plaintiff engaged in protected activity under Title VII by complaining about sexual advances by another employee, including, but not limited to, on January 10, 2019.

65. Defendant had knowledge of Plaintiff's protected complaint.

66. Defendant subjected Plaintiff to adverse actions, including, but not limited to, by making unsupported and untrue criticisms of Plaintiff's performance, placing Plaintiff on a performance improvement plan, making it clear to Plaintiff that Defendant would be terminating her employment if she did not agree to a separation agreement, and ultimately terminating Plaintiff's employment as of May 31, 2019.

67. There is a causal connection between Plaintiff's protected activity and the adverse actions taken against Plaintiff based on close temporal proximity, different in treatment before and after Plaintiff's protected activity, and the pretextual nature of Defendant's criticisms of Plaintiff's performance and justification for termination.

68. Defendant also discriminated against Plaintiff because of her sex, and Defendant's characterization of Plaintiff as too emotional, and admonition to Plaintiff that she needed to control her emotions, manifested gender bias and gender stereotyping against Plaintiff as a female.

69. Defendant's violation of Plaintiff's rights caused Plaintiff to suffer damages, including, but not limited to, lost compensation and benefits, compensatory damages, emotional distress, and loss of enjoyment.

70. Defendant exhibited a reckless disregard for Plaintiff's rights, entitling Plaintiff to punitive damages.

71. Plaintiff has also incurred, and continues to incur, attorney's fees and costs in pursuing this action.

**COUNT FOUR:     DISABILITY DISCRIMINATION IN VIOLATION OF THE
CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT**

72. Based on the foregoing, Defendant discriminated against Plaintiff based on disability in violation of the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60 et seq. ("CFEPA").

73.  During her employment with Defendant, Plaintiff suffered from a qualifying mental disability under the CFEPA.

74. Defendant had knowledge of Plaintiff's disability.

75. Plaintiff could perform all of the essential functions of her job, with or without a reasonable accommodation.

76. Defendant discriminated against Plaintiff, subjected Plaintiff to a performance improvement plan, and terminated Plaintiff's employment, because of Plaintiff's disability.

77. Defendant's violation of Plaintiff's rights caused Plaintiff to suffer damages, including, but not limited to, lost compensation and benefits, compensatory damages, emotional distress, and loss of enjoyment.

78. Plaintiff has incurred, and continues to incur, attorney's fees and costs in pursuing this action.

**COUNT FIVE:      RETALIATION IN VIOLATION OF CFEPA**

79. Based on the foregoing, Defendant retaliated against Plaintiff in violation of the CFEPA.

80. Defendant retaliated against Plaintiff in violation of CFEPA.

81. Plaintiff engaged in protected activity under CFEPA by complaining about sexual advances by another employee, including, but not limited to, on January 10, 2019.

82. Plaintiff also engaged in protected activity under CFEPA by exercising her rights to take a medical leave for her disability, which represents an accommodation for Plaintiff's disability.

83. Defendant had knowledge of Plaintiff's protected activity.

84. Defendant subjected Plaintiff to adverse actions, including, but not limited to, by making unsupported and untrue criticisms of Plaintiff's performance, placing Plaintiff on a performance improvement plan, making it clear to Plaintiff that Defendant would be terminating her employment if she did not agree to a separation agreement, and ultimately terminating Plaintiff's employment as of May 31, 2019.

85. There is a causal connection between Plaintiff's protected activity and the adverse actions taken against Plaintiff based on close temporal proximity, different in treatment before and after Plaintiff's protected activity, and the pretextual nature of Defendant's criticisms of Plaintiff's performance and justification for termination.

86. Defendant's violation of Plaintiff's rights caused Plaintiff to suffer damages, including, but not limited to, lost compensation and benefits, compensatory damages, emotional distress, and loss of enjoyment.

87. Plaintiff has also incurred, and continues to incur, attorney's fees and costs in pursuing this action.

**COUNT SIX:          SEX DISCRIMINATION IN VIOLATION OF CFEPA**

88. Defendant also discriminated against Plaintiff because of her sex in violation of CFEPA.

89. Plaintiff is a female.

90. Defendant's characterization of Plaintiff as too emotional, and admonition to Plaintiff that she needed to control her emotions, manifested gender bias and gender stereotyping against Plaintiff as a female.

91. Defendant subjected Plaintiff to discriminatory adverse actions, including, but not limited to, by making unsupported and untrue criticisms of Plaintiff's performance, placing Plaintiff on a performance improvement plan, making it clear to Plaintiff that Defendant would be terminating her employment if she did not agree to a separation agreement, and ultimately terminating Plaintiff's employment as of May 31, 2019.

92. Defendant's justifications and explanations for these actions is a pretext.

93. Defendant's violation of Plaintiff's rights caused Plaintiff to suffer damages, including, but not limited to, lost compensation and benefits, compensatory damages, emotional distress, and loss of enjoyment.

94. Plaintiff has also incurred, and continues to incur, attorney's fees and costs in pursuing this action.

**DEMAND FOR RELIEF**

Plaintiff hereby demands Judgment against Defendant, a Trial by Jury, and other relief, including, but not limited to the following:

1.      Compensatory damages, economic damages, and non-economic damages, including, but not limited to, damages for lost compensation, wages and benefits, retirement benefits, loss of enjoyment, and emotional distress;

2.      Reinstatement and/or Front Pay;

3.      Liquidated damages;

4.      Attorney's fees and costs;

5.      Punitive damages;

6.      Interest;

7.      Other relief that in law or equity may pertain.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

PLAINTIFF,
CAROLINA STAR-MANNING

By:___/s/ *Todd Steigman*_____
Todd D. Steigman (ct26875)
Madsen, Prestley & Parenteau, LLC
402 Asylum Street
Hartford, CT 06103
Tel: (860) 246-2466;
Fax: (860) 246-1794
tsteigman@mppjustice.com
